IN THE COURT OF APPEALS OF NORTH CAROLINA

 2021-NCCOA-135

 No. COA20-212

 Filed 20 April 2021

 Surry County, No. 19 JB 46

 IN THE MATTER OF D.A.H.

 Appeal by the Juvenile from an order entered on 13 August 2019 by Judge

 Marion M. Boone in Surry County District Court. Heard in the Court of Appeals 27

 January 2021.

 Attorney General Joshua H. Stein, by Special Deputy Attorney General Vanessa
 N. Totten, for the State.

 Appellate Defender Glenn Gerding, by Assistant Appellate Defender Jillian C.
 Katz, for the Juvenile.

 JACKSON, Judge.

¶1 The issue in this case is whether a juvenile is entitled to Miranda warnings

 prior to being interrogated by his school principal, when the school resource officer

 (“SRO”) is present but does not ask questions. Because we conclude that the trial

 court relied on an improper legal test in determining that the juvenile was not

 entitled to Miranda warnings, we reverse and remand this matter for further

 proceedings.

 I. Factual and Procedural Background

¶2 This matter arises from a series of events that occurred at Gentry Middle
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 School in Mount Airy, North Carolina during March 2019. On 11 March 2019, Deputy

 William Sechrist—who acted as the SRO at Gentry Middle School—was informed by

 school personnel that a student, Daniel,1 had been found with marijuana on the

 school bus. The school bus driver had observed Daniel holding a small netted bag

 containing a leafy substance. The bus driver handed over the bag to Deputy Sechrist,

 who recognized the substance as marijuana. Deputy Sechrist then escorted Daniel

 to the principal’s office and called Daniel’s father.

¶3 Once inside the principal’s office, Daniel “asked to speak freely,” but Deputy

 Sechrist told him to “wait until your daddy gets here.” Once Daniel’s father arrived,

 Daniel told Deputy Sechrist the details of how he obtained the marijuana. Daniel

 explained that the previous weekend, he had contacted a fellow student—13-year-old

 Deacon—via Snapchat asking to buy some marijuana. Daniel and Deacon then met

 up in the school locker room on the morning of March 11, and Deacon gave Daniel a

 small bag of marijuana in exchange for $25. Deputy Sechrist performed a field test

 on the substance, which confirmed that the substance was 0.7 grams of marijuana.

¶4 Deacon was absent from school the following two days (March 12 and 13) and

 the record contains no indication that the school or the deputy took any efforts to

 contact Deacon or his guardian during this time. On 14 March 2019, Deacon

 1 Pseudonyms are used to protect the privacy of the juveniles.
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 reappeared in class and was summoned to the principal’s office. When Deacon

 arrived at the principal’s office, both Principal Whitaker and Deputy Sechrist were

 present. Deputy Sechrist was in uniform, and Principal Whitaker was wearing a suit

 and tie. Principal Whitaker and Deputy Sechrist sat together on one side of the table,

 facing Deacon. At the time that Deacon arrived, his guardian had not been told that

 Deacon was in the principal’s office.

¶5 Principal Whitaker began questioning Deacon. The only evidence of what

 occurred during this meeting comes from the testimony of Deputy Sechrist, who

 offered three slightly differing accounts of how the meeting proceeded. When first

 asked about the meeting (on direct examination), Deputy Sechrist did not specify

 what precisely was asked of Deacon, but stated that Deacon “advised Mr. Whitaker

 he did not come to school for two days [because] he was scared he was going to get in

 trouble because he . . . sold marijuana to [Daniel].”

¶6 When asked about the meeting for a second time on cross-examination, Deputy

 Sechrist stated that Principal Whitaker had “asked [Deacon] to tell . . . what had

 taken place,” and in response Deacon told them “that he had sold [Daniel] some

 marijuana, where he got it, and all this other stuff.”

¶7 When asked about the meeting for a third time on redirect-examination,

 Deputy Sechrist described the conversation in more detail, explaining that the

 following exchange occurred between Deacon and Principal Whitaker:
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 [Principal]: Where have you been for the last few days?

 [Deacon]: Well, I’ve been afraid to come to school I’d get
 in trouble [sic].

 [Principal]: In trouble for what?

 [Deacon]: What I sold [Daniel].

 [Principal]: What did you sell him?

 [Deacon]: Marijuana.

¶8 Deputy Sechrist stated that after this confession, Principal Whitaker called

 Deacon’s grandmother, who arrived “probably . . . 10 minutes” after Deacon was

 brought into the office. He also stated that “[n]ot very many questions were even

 asked prior to her arrival.”

¶9 After Deacon’s grandmother arrived, the principal asked Deacon to tell his

 grandmother “what had taken place[,]” and Deacon repeated his statements to his

 grandmother. Deputy Sechrist testified that at no point was Deacon read his

 Miranda rights, told he did not have to answer their questions, nor told that he was

 free to leave.

¶ 10 Several months later, a juvenile petition was filed on 13 May 2019 alleging

 that Deacon had sold a schedule six controlled substance (marijuana) to another

 student in violation of N.C. Gen. Stat. § 90-95(a)(1). Deacon filed a motion to suppress

 on 13 August 2019, arguing that his statements to Principal Whitaker were
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

inadmissible as his confession was obtained in violation of his Miranda rights. A

hearing was held on the matter that same day (13 August 2019), during which the

trial court concluded that Deacon was not entitled to Miranda warnings because the

meeting with the principal was not a custodial interrogation. In denying Deacon’s

motion to suppress, the trial court found and concluded in open court as follows:

 I am going to deny the Motion to Suppress. A
 number of things stand out to me. The officer . . . he is the
 SRO. He’s there every day. This wasn’t some strange
 police officer that was called to stand guard at the door. I
 think it’s not unusual in a school setting for many or any of
 the children to be called to the office or principal’s office. I
 don’t think that automatically tends to turn it into a
 custodial interrogation. The young man was not in
 custody. He wasn’t even questioned by the School Resource
 Officer, who was a daily presence there at the school. It
 wasn’t some strange officer in a uniform.

 Also, another reference was made, of which I think
 that anybody at school would have had reason to ask, if
 apparently [Deacon] was out of school. Because the officer
 said that [Deacon] . . . told the principal he didn’t come to
 school for two days because he was scared he would get in
 trouble for selling marijuana. I don’t know that any officer
 would ever even ask: Why didn’t you come to school? But
 a principal certainly would or should ask if a child’s been
 absent from school.

 Therefore, I don’t see that it was outside the scope of
 anything. I think that was certainly, regardless of who was
 in the room or not, a proper question. And that’s what it
 sounds like it was in response to: Why weren’t you in
 school the past two days? Well, I didn’t come to school the
 past two days because I was afraid I’d get in trouble for
 selling marijuana to [Daniel].
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 So I don’t see this as a custodial interrogation. And
 the motion is denied.

¶ 11 Deacon was ultimately adjudicated delinquent for the sale and delivery of

 marijuana. In adjudicating Deacon delinquent, the trial court relied on Deacon’s

 confession that he had sold marijuana to Daniel, as well as Daniel and Deputy

 Sechrist’s hearing testimony that the substance sold was marijuana.

¶ 12 A disposition order was not entered within 60 days after entry of the

 adjudication order, so, pursuant to N.C. Gen. Stat. § 7B-2602, Deacon entered notice

 of appeal within 70 days from entry of the adjudication order. The trial court ordered

 on 25 October 2019 that disposition was stayed pending resolution of Deacon’s appeal.

 II. Analysis

¶ 13 On appeal, Deacon argues that the trial court erred in denying his motion to

 suppress because his statements were the product of a custodial interrogation and

 made without Miranda warnings or the additional protections of N.C. Gen. Stat.

 § 7B-2101. Deacon further argues that the trial court’s error was prejudicial and not

 harmless beyond a reasonable doubt. As explained below, we hold that the trial

 court’s order fails to apply the appropriate legal principles, and we must remand this

 matter to the trial court for additional proceedings.

 A. Standard of Review

¶ 14 Our review of a trial court’s order on a motion to suppress is “strictly limited
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 to determining whether the trial judge’s underlying findings of fact are supported by

 competent evidence, in which event they are conclusively binding on appeal, and

 whether those factual findings in turn support the judge’s ultimate conclusions of

 law.” State v. Cooke, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). “Legal

 conclusions, including the question of whether a person has been interrogated while

 in police custody, are reviewed de novo.” In re K.D.L., 207 N.C. App. 453, 456, 700

 S.E.2d 766, 769 (2010). Under de novo review, this Court “considers the matter anew

 and freely substitutes its own judgment for that of the lower tribunal.” In re A.K.D.,

 227 N.C. App. 58, 60, 745 S.E.2d 7, 8 (2013) (citation omitted).

 B. Motion to Suppress—Legal Background

 1. Juvenile Miranda Rights

¶ 15 This case presents a unique issue regarding the nature and extent of a

 juvenile’s right to receive Miranda warnings in the context of a school interrogation.

 Miranda rights stem from the Fifth Amendment of the United States Constitution,

 which guarantees that “[n]o person . . . shall be compelled in any criminal case to be

 a witness against himself.” U.S. CONST. amend. V. The basic holding of Miranda v.

 Arizona instructs that “when an individual is taken into custody or otherwise

 deprived of his freedom by the authorities in any significant way and is subjected to

 questioning, the privilege against self-incrimination is jeopardized” and thus

 “[p]rocedural safeguards must be employed.” Miranda v. Arizona, 384 U.S. 436, 478,
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 (1966).

¶ 16 It is well-established that juveniles, just like adults, are entitled to receive

 Miranda warnings prior to in-custody interrogations in order to protect their right

 against self-incrimination. In re Gault, 387 U.S. 1, 55 (1967). See also K.D.L., 207

 N.C. App. at 457, 700 S.E.2d at 770 (“In order to protect the Fifth Amendment right

 against compelled self-incrimination, suspects, including juveniles, are entitled to the

 warnings set forth in Miranda v. Arizona prior to police questioning.”).

¶ 17 In addition to the rights mandated by Miranda, in North Carolina our General

 Assembly “has established statutory protections for juveniles” who face custodial

 interrogation. In re L.I., 205 N.C. App. 155, 158, 695 S.E.2d 793, 797 (2010).

 Specifically, under N.C. Gen. Stat. § 7B-2101,

 [a]ny juvenile in custody must be advised prior to
 questioning:

 (1) That the juvenile has a right to remain silent;

 (2) That any statement the juvenile does make can
 be and may be used against the juvenile;

 (3) That the juvenile has a right to have a parent,
 guardian, or custodian present during
 questioning; and

 (4) That the juvenile has a right to consult with an
 attorney and that one will be appointed for the
 juvenile if the juvenile is not represented and
 wants representation.
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 N.C. Gen. Stat. § 7B-2101(a)(1)–(4) (2019).

¶ 18 The Juvenile Code provides for even greater protections if the juvenile who is

 interrogated is younger than 16:

 When the juvenile is less than 16 years of age, no in-
 custody admission or confession resulting from
 interrogation may be admitted into evidence unless the
 confession or admission was made in the presence of the
 juvenile’s parent, guardian, or attorney. If an attorney is
 not present, the parent, guardian, or custodian as well as
 the juvenile must be advised of the juvenile’s rights as set
 out in subsection (a) of this section; however, a parent,
 guardian, or custodian may not waive any right on behalf
 of the juvenile.

 Id. § 7B-2101(b). In this respect, “our General Statutes codify and enhance the

 protections required under Miranda.” In re J.D.B., 363 N.C. 664, 668, 686 S.E.2d

 135, 138 (2009) (emphasis added), rev’d and remanded sub nom. J.D.B. v. North

 Carolina, 564 U.S. 261 (2011). However, the protections of Miranda and § 7B-2101

 are only triggered when the juvenile is subjected to a custodial interrogation. In re

 A.N.C., 225 N.C. App. 315, 319, 750 S.E.2d 835, 838 (2013). In other words, “the

 general Miranda custodial interrogation framework is applicable to section 7B-2101.”

 In re K.D.L., 207 N.C. App. at 458, 700 S.E.2d at 770.

¶ 19 In general, a custodial interrogation occurs when “questioning [is] initiated by

 law enforcement officers after a person has been taken into custody or otherwise

 deprived of his freedom of action in any significant way.” Id. (internal marks and
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 citation omitted). This inquiry has traditionally been broken down into a two-part

 test: (1) whether the suspect was in custody; and (2) whether the statement was

 made in the context of an interrogation. See id.

¶ 20 As for the custody element, the basic test is “whether a reasonable person in

 the position of the defendant would believe himself to be in custody or that he had

 been deprived of his freedom of action in some significant way.” State v. Greene, 332

 N.C. 565, 577, 422 S.E.2d 730, 737 (1992). This element is viewed objectively from

 the standpoint of a reasonable observer. Stansbury v. California, 511 U.S. 318, 323

 (1994). As for the interrogation element, an interrogation occurs when the authorities

 use “any words or actions” that they “should know are reasonably likely to elicit an

 incriminating response from the suspect.” Rhode Island v. Innis, 446 U.S. 291, 301

 (1980). This element “is also determined objectively” with reference to the “totality

 of the circumstances.” In re K.D.L., 207 N.C. App. at 458, 700 S.E.2d at 770.

 2. Juvenile Miranda Rights in the Context of the Schoolhouse

¶ 21 The questioning of juveniles in the context of the schoolhouse presents unique

 Miranda considerations. First, it should be noted that Miranda “does not

 automatically apply to all government actors”—rather, it only applies to

 interrogations conducted by (or in concert with) law enforcement officers. Id. at 459,

 700 S.E.2d at 771. For example, a student simply being questioned by a principal

 would not generally qualify as a custodial interrogation, but a student questioned by
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 an SRO certainly could. See id. Second, the schoolhouse is a unique forum because

 “schoolchildren inherently shed some of their freedom of action when they enter the

 schoolhouse door,” given educators’ need “to control the school environment.” Id.

 (internal marks and citation omitted). Due to the constraints inherent in the

 schoolhouse environment, we have held that a child is only under custodial

 interrogation when “he is subjected to additional restraints beyond those generally

 imposed during school.” Id.

¶ 22 The first case to fully articulate this heightened schoolhouse standard was In

 re K.D.L., 207 N.C. App. at 454, 700 S.E.2d at 768. There, after a 12-year-old student

 was discovered with marijuana in the classroom, he was taken to the assistant

 principal’s office. Id. The SRO arrived at the assistant principal’s office, briefly spoke

 with the juvenile, frisked him to search for weapons, and then transported the

 juvenile in his patrol car to the principal’s office (which was located in a separate

 building). Id. Once in the principal’s office, the SRO remained present while the

 principal questioned the juvenile. Id. The juvenile first denied that the marijuana

 was his, but eventually confessed. Id. All in all, the juvenile was questioned “for

 about five or six hours” by the principal and “was not permitted to leave for lunch.”

 Id. at 455, 700 S.E.2d at 768. The questioning began around 9:00 a.m., but the

 juvenile’s mother was not contacted until around 3:00 p.m. Id. The juvenile later

 filed a motion to suppress, which was denied by the trial court. Id. at 455, 700 S.E.2d
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 at 768-69.

¶ 23 On appeal, we held that the juvenile’s confession “should have been

 suppressed” as it was obtained in violation of his Miranda rights. Id. at 456, 700

 S.E.2d at 769. We noted that “despite the decreased level of freedoms in schools,” we

 still must not “forget that police interrogation is inherently coercive—particularly for

 young people.” Id. at 459, 700 S.E.2d at 771. We emphasized that the State “has a

 greater duty to protect the rights of a respondent in a juvenile proceeding than in a

 criminal prosecution.” Id. at 460, 700 S.E.2d at 771 (internal marks and citation

 omitted).

¶ 24 We concluded that the juvenile’s statements were made during a custodial

 interrogation because “a reasonable person in his situation would believe he was

 functionally under arrest.” Id. at 461, 700 S.E.2d at 772. As for the custody element

 of the Miranda test, we relied on the following factors to conclude that the juvenile

 was in custody: (1) the juvenile “knew he was suspected of a crime” and was “accused

 of drug possession”; (2) he “was interrogated for about six hours”; (3) the interrogation

 occurred “generally in the presence of an armed police officer”; (4) the juvenile “was

 frisked by that officer and transported in the officer’s vehicle” to the principal’s office;

 and (5) “at no point was there any indication that [the juvenile] was free to leave.”

 Id. We reasoned that these occurrences went beyond “the usual restraints generally

 imposed during school” and instead were closer to those that would “likely [be]
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 experienced by an arrestee.” Id.

¶ 25 As for the interrogation element of the Miranda test, we first noted that this

 was a “unique situation because [the SRO] did not ask any questions.” Id.

 Nevertheless, we concluded that an interrogation had occurred because

 [the SRO’s] conduct significantly increased the likelihood
 [the juvenile] would produce an incriminating response to
 the principal’s questioning. His near-constant supervision
 of [the juvenile’s] interrogation and “active listening” could
 cause a reasonable person to believe [the principal] was
 interrogating him in concert with [the SRO] or that the
 person would endure harsher criminal punishment for
 failing to answer.

 Id. Thus, because the juvenile had “made his confession in the course of custodial

 interrogation without being afforded the warnings required by Miranda and section

 7B-2101(a), and because he was not apprised of and afforded his right to have a

 parent present,” we held that the trial court erred in denying the motion to suppress.

 Id. at 462, 700 S.E.2d at 773.

¶ 26 Another prominent recent case addressing the issue of schoolhouse

 interrogations was In re J.D.B., 363 N.C. at 668, 686 S.E.2d at 138 (2009). There, a

 13-year-old student was called into the principal’s office after he was found in

 possession of a stolen camera. Id. at 665-66, 686 S.E.2d at 136. Present in the room

 were the assistant principal, the SRO, and an investigator employed by the local

 police force. Id. Prior to the meeting, the juvenile was not given a Miranda warning,
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 and was not offered the opportunity to speak with a parent. Id. During the

 approximately 30 to 45 minute interview, the assistant principal repeatedly urged

 the juvenile to “do the right thing” and “tell the truth,” and the investigator informed

 him that he knew about the stolen cameras. Id. at 666-67, 686 S.E.2d at 136-37. The

 juvenile ultimately confessed to having stolen the cameras, and these incriminating

 statements later resulted in an unsuccessful motion to suppress by the juvenile. Id.

 at 666-68, 686 S.E.2d at 137.

¶ 27 When the case reached the North Carolina Supreme Court, the Court held that

 no Miranda warning was necessary because no custodial interrogation had occurred.

 Id. at 670, 686 S.E.2d at 139. The Court based its holding on the fact that the SRO

 participated only minimally in the questioning; the juvenile was not restrained or

 locked in the room; and the juvenile appeared to have participated willingly. Id. The

 Court specifically declined to consider the juvenile’s “age and his status as a special

 education student” in reaching its holding, explaining that these factors were not an

 appropriate part of the objective test under Miranda. Id. at 671-72, 686 S.E.2d at

 139-40.

¶ 28 The United States Supreme Court disagreed, however, granting certiorari to

 review whether “a child’s age would have affected how a reasonable person in the

 suspect’s position would perceive his or her freedom to leave.” J.D.B. v. North

 Carolina, 564 U.S. 261, 271-72 (2011) (internal marks and citation omitted). The
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 Court ultimately reversed and remanded the case, after determining that a child’s

 age should be a relevant consideration in a custody analysis. Id. at 281.

¶ 29 The Court began by noting the “inherently compelling pressures” of custodial

 interrogation—a risk which is “all the more acute” when the subject is a juvenile. Id.

 at 269 (internal marks and citation omitted). Observing that “children generally are

 less mature and responsible than adults,” the Court went on to note that minors also

 “often lack the experience, perspective, and judgment to recognize and avoid choices

 that could be detrimental to them.” Id. at 272 (internal marks and citation omitted).

 Specific to law enforcement interrogations, “a reasonable child subjected to police

 questioning will sometimes feel pressured to submit when a reasonable adult would

 feel free to go,” the Court observed. Id. And in many cases, “the custody analysis

 would be nonsensical absent some consideration of the suspect’s age.” Id. at 275.

¶ 30 The Court considered the school setting to present just such a situation. Id.

 In the school setting, “[n]either officers nor courts can reasonably evaluate the effect

 of objective circumstances that, by their nature, are specific to children without

 accounting for the age of the child subjected to those circumstances[,]” the Court

 reasoned. Id. at 276. The Court went on to note that

 the effect of the schoolhouse setting cannot be disentangled
 from the identity of the person being questioned. A
 student—whose presence at school is compulsory and
 whose disobedience at school is cause for disciplinary
 action—is in a far different position than, say, a parent
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 volunteer on school grounds to chaperone an event[.] . . .
 Without asking whether the person questioned in the
 school is a minor, the coercive effect of the schoolhouse
 setting is unknowable.

 Id. at 276 (internal marks and citation omitted).

¶ 31 Accordingly, the Court found that considering a child’s age was perfectly

 consistent with the objective nature of the Miranda test. Id. The Court cautioned

 that while “a child’s age will [not] be a determinative, or even a significant, factor in

 every case,” in many cases it is “a reality that courts cannot simply ignore.” Id. at

 277. Thus, the Court ultimately held that “so long as the child’s age was known to

 the officer at the time of police questioning, or would have been objectively apparent

 to a reasonable officer, its inclusion in the custody analysis is consistent with the

 objective nature of that test.” Id. at 277.

¶ 32 Another prominent decision in our juvenile Miranda caselaw was In re D.A.C.,

 225 N.C. App. 547, 741 S.E.2d 378 (2013). There, officers were investigating gunshots

 that had been fired into a home when they encountered a juvenile in the yard across

 the street. Id. at 548, 741 S.E.2d at 379. The juvenile’s father came outside and

 encouraged the juvenile “to go with the officers and to be truthful.” Id. The officers

 asked the juvenile if he would speak with them and they received an affirmative

 response. Id. They walked with the juvenile to the corner of the yard, about “ten feet

 outside the home, where they talked for about five minutes.” Id. They all stood at
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 arms’ length from each other, and though both officers were armed, “neither of them

 touched or made any movement towards their weapons at any point.” Id. at 548-49,

 741 S.E.2d at 380. However, the officers never expressly told the juvenile that he was

 free to leave or that he did not have to answer their questions. Id.

¶ 33 After the officers asked the juvenile whether he had fired the shots, the

 juvenile confessed. Id. at 549, 741 S.E.2d at 380. The juvenile later filed a motion to

 suppress his confession for violation of his Miranda rights, which was denied by the

 trial court. Id. On appeal, we held that the trial court acted properly because the

 juvenile was not subjected to a custodial interrogation while speaking with the

 officers. Id. at 550, 741 S.E.2d at 380. “A careful analysis of the totality of the

 circumstances surrounding the making of [the] Juvenile’s statement clearly

 indicate[d] . . . that [he] was not subject to the degree of restraint inherent in a formal

 arrest[,]” we reasoned. Id. at 552, 741 S.E.2d at 382. We relied on the fact that (1)

 the officers “asked him to step outside, rather than instructing him to do so”; (2) the

 juvenile did nothing more than “answer a simple, straightforward question” posed to

 him by the officers; (3) during the conversation, all three participants “were standing

 and remained at arm’s length from each other”; (4) the conversation occurred “in

 broad daylight,” “in an open area in [the juvenile’s] own yard with his parents

 nearby”; and (5) the conversation only lasted for about five minutes. Id. at 553, 741

 S.E.2d at 382.
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

¶ 34 Finally, In re R.P., 216 N.C. App. 585, 718 S.E.2d 423, 2011 WL 5185568 (2011)

 (unpublished), demonstrates how this Court has addressed cases that fail to properly

 apply the standard from J.D.B. There, a high-school student filed a motion to

 suppress an incriminating statement he made to an SRO, but his motion was denied

 by the trial court. Id. at *1-2. On appeal, we discussed the decisions in both In re

 K.D.L. and J.D.B., noting that under then-current North Carolina Miranda law, we

 were required to consider both (1) whether the student had been subjected to

 restraints that go beyond “the limitations that are characteristic of the school

 environment in general,” and (2) how “the juvenile’s age and experience” might factor

 into the custodial question. Id. at *3 (internal marks and citation omitted). However,

 because the trial court failed to issue a written order, and because the trial transcript

 left us “unable to discern whether the trial court considered the juvenile’s age in

 accordance with the United States Supreme Court’s mandate in In re J.D.B.,” we

 concluded that it necessary to remand the matter for further fact-finding. Id. at *4.

 3. Clarifying the Juvenile Custodial Interrogation Test

¶ 35 Today we harmonize our prior opinions on this issue in light of the United

 States Supreme Court’s holding in J.D.B. and the holdings of our sister courts in

 other states. There can be no doubt that educators and law enforcement are

 increasing their collaboration in the school setting and that school officials are

 increasingly becoming active participants in the criminal justice system. While
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 potentially warranted for both the educational and safety needs of our children, this

 cooperation must be consistent with the Fifth Amendment’s guarantee against self-

 incrimination. As the United States Supreme Court recognized in J.D.B., the Fifth

 Amendment requires that minors under criminal investigation be protected against

 making coerced, inculpatory statements, even when—and perhaps, in some cases,

 particularly because—they are on school property. J.D.B., 564 U.S. at 275. Increased

 cooperation between educators and law enforcement cannot allow the creation of

 situations where no Miranda warnings are required just because a student is on

 school property.

¶ 36 To that end, we believe that one aspect of the schoolhouse Miranda test is

 particularly deserving of an in-depth review here—namely, the extent of the SRO’s

 involvement in the interrogation. On one end of the custodial spectrum, it is near-

 universally agreed that a meeting solely between a student and school officials

 generally will not qualify as a custodial interrogation. See In re K.D.L., 207 N.C. App.

 at 459, 700 S.E.2d at 771 (noting that Miranda “does not automatically apply to all

 government actors”—rather, it only applies to interrogations conducted by, or in

 concert with, law enforcement officers); D.Z. v. State, 100 N.E.3d 246, 247 (Ind. 2018)

 (“[W]hen school officials alone meet with students, a clear rule governs: Miranda

 warnings are not required.”); Martin R. Gardner, Removing Miranda from School

 Interrogations, 99 NEB. L. REV. 16, 30 (2020) (“If there is no law enforcement
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 involvement, then there is no custody and no Miranda applicability.”).

¶ 37 On the other end of the spectrum, an interview that features heavy SRO

 involvement or direction will often qualify as a custodial interrogation. See, e.g., In

 re R.H., 568 Pa. 1, 4-8, 791 A.2d 331, 332-35 (2002) (holding that Miranda warnings

 should have been given where a student was removed from class by an SRO and

 interrogated by the officer for 25 minutes, and where the interrogation “ultimately

 led to charges by the municipal police, not punishment by school officials pursuant to

 school rules”).

¶ 38 Then there are cases between those two ends of the spectrum—cases like the

 present one—where the SRO is present while the juvenile is questioned by school

 officials but does not participate in the questioning, or where the SRO participates

 minimally in the questioning. We hold that circumstances such as these can indeed

 qualify as custodial interrogations where Miranda warnings are required. As

 discussed above, in In re K.D.L., we held that Miranda warnings were required even

 when the SRO remained silent throughout the juvenile’s interview. See In re K.D.L.,

 207 N.C. App. at 461, 700 S.E.2d at 772 (holding that a custodial interrogation had

 occurred—despite the fact that the SRO “did not ask any questions”—because the

 SRO’s “near-constant supervision” of the interrogation and “active listening”

 throughout might “cause a reasonable person to believe” that the principal was

 interrogating the juvenile “in concert with” the SRO).
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

¶ 39 Today we reaffirm this principle. We agree that when a student is interrogated

 in the presence of an SRO—even when the SRO remains silent—the presence of the

 officer can create a coercive environment that goes above and beyond the restrictions

 normally imposed during school, such that a reasonable student would readily believe

 they are not free to go. This holding recognizes the “reality that courts cannot simply

 ignore”—that juveniles are uniquely susceptible to police pressure and may feel

 compelled to confess when a reasonable adult would not. J.D.B., 564 U.S. at 277.

¶ 40 Moreover, this holding is consistent with the decisions of other state appellate

 courts. Since the time In re K.D.L. was decided in 2010, several other state appellate

 courts have approved of this rationale—recognizing that oftentimes the presence of

 an SRO during schoolhouse questioning can transform what otherwise might appear

 to be a voluntary encounter into a custodial interrogation. See, e.g., N.C. v.

 Commonwealth, 396 S.W.3d 852, 854-62 (Ky. 2013) (holding that Miranda warnings

 were required when the SRO was “present throughout” the juvenile’s interrogation

 by the principal—despite the SRO’s minimal involvement in the questioning—

 because “[n]o reasonable student . . . would have believed that he was at liberty to

 remain silent, or to leave” under the circumstances); State v. Antonio T., 352 P.3d

 1172, 1179-80 (N.M. 2015) (holding that the SRO’s “mere presence during [the

 principal’s] questioning of [the juvenile] converted the school disciplinary

 interrogation into a criminal investigatory detention,” because the SRO’s presence
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 “created a coercive and adversarial environment that does not normally exist during

 interactions between school officials and students”); B.A. v. State, 100 N.E.3d 225,

 229-34 (Ind. 2018) (holding that although the officers “did not directly question” the

 juvenile during his interrogation by the principal, nevertheless the “consistent police

 presence” throughout the interview “would place considerable coercive pressure on a

 reasonable student in [the juvenile’s] situation” and required the provision of

 Miranda warnings).

¶ 41 Thus, we reiterate that the presence of an SRO (or other law enforcement

 officer) while a student is interrogated by a school official weighs heavily on the scale

 when determining whether what otherwise might appear to be a voluntary encounter

 is instead a custodial interrogation. However, we also note that the involvement of

 an SRO in the questioning is a factor which is relevant, but is not by itself dispositive,

 to the question of whether the encounter between a child and a school official is a

 custodial interrogation. We still must look to all of the remaining Miranda factors to

 determine if any statements the student makes were the product of a custodial

 interrogation.

 a. Custody

¶ 42 The first element of the Miranda test asks whether the juvenile was in

 custody. As explained by the United States Supreme Court,
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 [W]hether a suspect is in custody is an objective
 inquiry. Two discrete inquiries are essential to the
 [custody] determination: first, what were the
 circumstances surrounding the interrogation; and second,
 given those circumstances, would a reasonable person have
 felt he or she was at liberty to terminate the interrogation
 and leave.

 ...

 Rather than demarcate a limited set of relevant
 circumstances, we have required police officers and courts
 to examine all of the circumstances surrounding the
 interrogation, including any circumstances that would
 have affected how a reasonable person in the suspect’s
 position would perceive his or her freedom to leave.

 J.D.B., 564 U.S. at 270-71 (internal marks and citation omitted).

¶ 43 After thoroughly reviewing the caselaw from this state, the United States

 Supreme Court, and persuasive authority from other jurisdictions, we conclude that

 the following factors are most relevant in determining whether a juvenile is in

 custody in the context of a schoolhouse interview:

 (1) traditional indicia of arrest;

 (2) the location of the interview;

 (3) the length of the interview;

 (4) the student’s age;

 (5) what the student is told about the interview;

 (6) the people present during the interview; and,
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 (7) the purposes of the questioning.

¶ 44 First—was the student subjected to any of the traditional indicia of arrest? If

 the student was handcuffed, transported in a police car, subjected to a search of his

 or her person or belongings, or otherwise bodily restrained, then this is a strong

 indication that the student was in custody. See, e.g., In re K.D.L., 207 N.C. App. at

 461, 700 S.E.2d at 772 (juvenile was in custody when he was “frisked by [the] officer

 and transported in the officer’s vehicle to [the principal’s] office,” as this is a type of

 restraint that is “more likely experienced by an arrestee” than a student); State v.

 Buchanan, 353 N.C. 332, 339, 543 S.E.2d 823, 828 (2001) (“Circumstances supporting

 an objective showing that one is ‘in custody’ might include a police officer standing

 guard at the door, locked doors, or application of handcuffs.”); B.A., 100 N.E.3d at 232

 (“On the other end of the [custody] spectrum lie armed and uniformed police officers

 who pull students from class in handcuffs before questioning them.”).

¶ 45 Second—where was the interview held? If the interview was conducted in a

 location that a reasonable child might consider confining, this tends to show that the

 child was in custody. See, e.g., State v. Doe, 130 Idaho 811, 818, 948 P.2d 166, 173

 (1997) (“We think it unlikely that the environment of a principal’s office or a faculty

 room is considered by most children to be a familiar or comfortable setting, for

 students normally report to these locations for disciplinary reasons[.]”). On the other

 hand, if the interview was held in a location where a child is likely to feel comfortable
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 and at-ease, this tends to show that the child was not in custody. See, e.g., In re

 D.A.C., 225 N.C. App. at 553, 741 S.E.2d at 382 (holding that no custody occurred

 because “instead of being involved in a closed door conference room with police and

 an assistant principal, [the] juvenile was questioned in an open area in his own yard

 with his parents nearby”) (internal marks and citation omitted). Other relevant

 considerations include the size of the room, whether the door was closed or locked,

 and the child’s familiarity with that specific location.

¶ 46 Third—how long was the interview? A long, drawn-out questioning tends to

 show that the child was in custody, whereas a very brief questioning does not.

 Compare In re K.D.L., 207 N.C. App. at 461, 700 S.E.2d at 772 (juvenile was in

 custody where he “was interrogated for about six hours, generally in the presence of

 an armed police officer”) with In re D.A.C., 225 N.C. App. at 553, 741 S.E.2d at 382

 (juvenile was not in custody when “the conversation between Juvenile and the

 investigating officers . . . lasted for about five minutes”). Other relevant

 considerations include whether the child was offered a place to sit, and whether the

 child is offered common courtesies such as food, water, or bathroom breaks. See State

 v. Hammonds, 370 N.C. 158, 164, 804 S.E.2d 438, 443 (2017) (suspect was not in

 custody when “the detectives offered [him] food or drink” and bathroom breaks were

 made available).

¶ 47 Fourth—how old was the student? As explained by the United States Supreme
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 Court in J.D.B., younger children are far more “vulnerable or susceptible to outside

 pressures” than older children or adults. See J.D.B., 564 U.S. at 272 (internal marks

 and citation omitted). Thus, the younger the student, the more sensitive the student

 will be to circumstances that could be coercive—“[s]o long as the child’s age was

 known to the officer at the time of the interview, or would have been objectively

 apparent to any reasonable officer.” Id. at 274. Compare Doe, 130 Idaho at 819, 948

 P.2d at 174 (holding that it was “unlikely that any ten-year-old would feel free to

 simply leave” when questioned by an SRO or school authorities); with J.D.B., 564

 U.S. at 277 (explaining that “teenagers nearing the age of majority” are unlikely to

 feel the same coercive pressures as younger children) (internal marks and citation

 omitted).

¶ 48 Fifth—what was the student told about the interview? If the student is

 informed that he or she is free to leave, that answering questions is not required, or

 is offered the opportunity to call a parent or guardian, then this tends to show that

 the student was not in custody. See, e.g., In re Hodge, 153 N.C. App. 102, 108, 568

 S.E.2d 878, 882 (2002) (juvenile was not in custody when the detective “prefaced her

 interview with [the juvenile] by saying, ‘you don’t have to talk to me,’ ‘I am not going

 to arrest you’”). On the other hand, if the student is not informed about the nature

 of the interview, and is not told whether his or her presence is compulsory or

 voluntary, this weighs in favor of the conclusion that the student was in custody. See
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 In re K.D.L., 207 N.C. App. at 461-62, 700 S.E.2d at 772-73 (juvenile was in custody

 where he “knew he was suspected of a crime,” and there was “no suggestion anything

 transpired that would cause him to believe he was free to leave”). And of course, a

 student is certainly in custody if he or she is expressly told not to leave.

¶ 49 Sixth—who all is present during the interview? If the student is questioned in

 the presence of multiple SROs or other law enforcement officers, or even by numerous

 school officials, this tends to show that the student was in custody. See, e.g., B.A.,

 100 N.E.3d at 232 (considering the “number of officers present and how they are

 involved” as a key step in custody analysis). On the other hand, if a parent, guardian,

 or other person who can advocate for the child (such as a guidance counselor), is

 present or nearby during the interview, this suggests a reasonable child would not

 have felt coerced. Compare In re D.A.C., 225 N.C. App. at 553, 741 S.E.2d at 382

 (juvenile was not in custody when he was “questioned in an open area in his own yard

 with his parents nearby”); with Doe, 130 Idaho at 818, 948 P.2d at 173 (juvenile was

 in custody when “[n]o parent or other adult concerned with Doe’s best interest was

 present during the questioning”).

¶ 50 Seventh—what were the objectively apparent purposes of the interview? In

 other words, was the interview primarily a criminal investigation or primarily a

 school disciplinary matter? See Antonio T., 352 P.3d at 1179 (“Questioning a child

 for school disciplinary matters is distinguishable from questioning a child for
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 suspected criminal wrongdoing.”); N.C., 396 S.W.3d at 865 (explaining that even

 “when law enforcement is involved” in the questioning of a student, Miranda

 warnings are not necessary “if the matter purely concerns school discipline”). If the

 interview was the result of specific criminal suspicion directed toward the student,

 questioning occurring during the investigation of this suspicion will be subject to

 closer scrutiny by courts. See In re D.A.C., 225 N.C. App. at 552, 741 S.E.2d at 382

 (holding that “the degree to which suspicion had been focused on the defendant” prior

 to the interview is a relevant Miranda factor) (internal marks and citation omitted);

 In re K.D.L., 207 N.C. App. at 461, 700 S.E.2d at 772 (interview was custodial when

 juvenile “knew he was suspected of a crime” as opposed to a mere violation of school

 rules). On the other hand, if the interview is a disciplinary investigation into the

 breaking of school rules and its result is unlikely to involve the criminal justice

 system, questioning of the student will not be considered to have occurred while the

 student was in custody. See, e.g., Matter of Phillips, 128 N.C. App. 732, 735, 497

 S.E.2d 292, 294 (1998) (no Miranda warnings required when school officials “did not

 question the juvenile to obtain information to use in criminal proceedings but

 questioned her simply for school disciplinary purposes”).

¶ 51 The purpose of an interview (criminal vs. disciplinary) can also be revealed by

 examining the degree and nature of the cooperation between school officials and law

 enforcement, including an SRO. Did the SRO work with the school official by
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 following a set of pre-defined procedures in conducting the interview? For example,

 if school officials typically follow a certain process when disciplining a child for

 breaking school rules, and use a different process when investigating criminal

 activity, then the use of (or departure from) these procedures is instructive. See, e.g.,

 N.C., 396 S.W.3d at 854 (evidence showed that student was in custody when principal

 and SRO had employed a “loose routine they followed for questioning students when

 there was suspected criminal activity”).

 b. Interrogation

¶ 52 The second element of the Miranda test asks whether the juvenile was subject

 to an interrogation. Under this element, the primary concern is whether the

 authorities employed “any words or actions” that they “should know are reasonably

 likely to elicit an incriminating response from the suspect.” Innis, 446 U.S. at 301.

 The focus here is on “the suspect’s perceptions” of the encounter, “rather than on the

 intent of the law enforcement officer.” State v. Golphin, 352 N.C. 364, 406, 533 S.E.2d

 168, 199 (2000).

¶ 53 In the context of a schoolhouse interrogation, the following factors are most

 relevant to the interrogation element:

 (1) the nature of the questions asked (interrogative or mandatory);

 (2) the willingness of the juvenile’s responses; and,

 (3) the extent of the SRO’s involvement.
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

¶ 54 First—what was the nature of the statements made by the questioner? If the

 questions were mostly open-ended (e.g., “would you like to tell me what happened?”),

 this weighs against concluding that the questioning was an interrogation. See, e.g.,

 In re D.A.C., 225 N.C. App. at 553, 741 S.E.2d at 382 (juvenile was not subject to

 custodial interrogation when he was “asked . . . rather than instruct[ed]” to cooperate,

 and “did nothing more . . . than answer a simple, straightforward question”). On the

 other hand, if the questions are accompanied by imperative statements suggesting

 compliance is mandatory (e.g., “you have to tell me the truth”), this supports the

 conclusion that the questioning was an interrogation. See, e.g., In re K.D.L., 207 N.C.

 App. at 462, 700 S.E.2d at 773 (juvenile was subject to custodial interrogation when

 he was not “given the option of answering questions,” but rather was instructed to

 answer). The tone of voice, volume, and body language used by the questioner are

 also relevant here. See Hammonds, 370 N.C. at 164, 804 S.E.2d at 443 (no custodial

 interrogation when the conversation with the suspect was “calm and cordial in tone”

 and “the detectives offered [the suspect] food or drink”).

¶ 55 Second—how willingly did the subject respond to the questions? If the juvenile

 makes a wholly unsolicited or spontaneous statement, such a statement is unlikely

 to be considered to have been made in the context of interrogation. See In re D.L.D.,

 203 N.C. App. 434, 444, 694 S.E.2d 395, 403 (2010) (no custodial interrogation

 occurred when juvenile’s “unsolicited and spontaneous” statement was “not [made] at
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 the questioning of the officers”) (internal marks and citation omitted). On the other

 hand, if a juvenile expresses hesitancy or reluctance to answer, claims ignorance of a

 subject, or must be coaxed into answering, this weighs in support of the ultimate

 conclusion that any statements made occurred during an interrogation.

¶ 56 Third—what was the extent of the involvement of law enforcement? As

 discussed above, a custodial interrogation can occur even when the SRO is present

 while a student is interviewed by school officials but does not ask questions.

 However, the scope and extent of the SRO’s involvement in the questioning is still a

 relevant factor in ascertaining whether or not an interrogation occurred. If the SRO

 was not present for the entirety of the questioning or for significant portions of it, the

 absence of the officer can weigh against the conclusion that the questioning qualified

 as an interrogation. See In re R.B.L., 242 N.C. App. 383, 776 S.E.2d 363, 2015 WL

 4429626, at *1-8 (2015) (unpublished) (juvenile was not subject to custodial

 interrogation when the SRO “stood off to [the] side,” did not ask questions, and

 “entered and exited the room several times” during the interview). On the other

 hand, if the SRO directs the questioning, either by leading it or participating heavily

 in it, this weighs in support of the conclusion that the questioning was an

 interrogation. In re K.D.L., 207 N.C. App. at 461, 700 S.E.2d at 772.

¶ 57 Finally, we note that as with the reasonable adult standard, no single factor is

 controlling in determining whether statements made by a juvenile are the product of
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 custodial interrogation. Rather, the inquiry is whether the totality of the

 circumstances surrounding the questioning “add up to custody.” J.D.B., 564 U.S. at

 278 (citation omitted).

 C. Application

¶ 58 Now we turn to the facts of the present case and the issue of whether the

 statements Deacon made were the product of a custodial interrogation. To briefly

 review, 13-year-old Deacon was called into to the principal’s office after officers

 received a tip that Deacon had sold marijuana to another student. He was then

 questioned by the principal while the SRO was present the entire time, and after

 some prompting made a confession. It was not until after Deacon made this

 confession that his guardian was contacted, and at no point was he told that he was

 free to leave or to refuse to answer questions. We hold that this amounted to a

 custodial interrogation and that the trial court erred in concluding otherwise and

 denying the motion to suppress.

 1. Custody

¶ 59 First—would a reasonable student in Deacon’s place have felt free to terminate

 the interview and leave, under these circumstances? We conclude that a reasonable

 13-year-old would not, given the location of the interview, what Deacon could have

 known about the interview before it began, the people present during the interview,

 and the investigatory purpose of the interview.
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

¶ 60 Thirteen-year-old Deacon arrived at school on the morning of 14 March 2019

 knowing that he was in trouble—knowing that his classmate had recently been

 caught with the marijuana that Deacon had sold him. In fact, he had been absent

 from school the prior two days because he was so nervous about what might happen

 when he returned. His worries were confirmed when he was summoned to the

 principal’s office that morning, where both Principal Whitaker and Deputy Sechrist

 were waiting for him. The two authority figures sat together opposite Deacon.

 Deputy Sechrist was wearing his uniform, and Principal Whitaker was dressed

 formally in a suit. Deacon was not told that he was free to go, was not told that he

 did not have to answer questions, and was not told that he could call his grandmother

 if he wished.

¶ 61 We hold that, under these circumstances, no reasonable 13-year-old would

 have felt free to leave. Even before any questions were asked, it appeared that this

 interview was for purposes of a criminal investigation rather than a mere disciplinary

 matter. Deacon’s classmate Daniel had been caught with marijuana only three days

 prior, and had admitted that he bought the drugs from Deacon. Deputy Sechrist and

 Principal Whitaker were thus following a lead as a part of a criminal investigation

 when they called Deacon into the office to be questioned.

¶ 62 The State contends that this was purely a disciplinary matter (and that no

 Miranda warning was required) because Principal Whitaker was only concerned with
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 why Deacon had missed school the previous two days. While it is true that Deacon

 had missed school for two days, if this had been a pure disciplinary matter regarding

 Deacon’s absences, then there would have been no reason to have the SRO present.

 Though the record does not demonstrate what typical procedures Gentry Middle

 School follows when a student has accrued two days’ worth of absences—absences

 which might not have been unexcused2—we strongly suspect that not every instance

 involves a student being summoned out of class to meet with the principal and a

 uniformed SRO.

¶ 63 Moreover, once inside the principal’s office—an intimidating atmosphere to

 any reasonable 13-year-old—Deacon found himself in a room not only with the

 principal, but also the same officer that had questioned Daniel. A reasonable student

 in Deacon’s position would believe that he was going to be questioned about potential

 criminal behavior, not disciplined for missing two days of school. Accordingly, we

 hold that Deacon was in custody at the time of his questioning by Principal Whitaker

 and Deputy Sechrist.

 2. Interrogation

¶ 64 We must next address whether Deacon was subjected to interrogation—i.e.,

 whether the questioning was of a nature that the two authority figures should have

 2 Deputy Sechrist admitted at the suppression hearing that he did not know whether

 Deacon’s absences were unexcused.
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 known was likely to elicit an incriminating response from Deacon. We conclude that

 the answer to this question is also yes, given the nature of the questions asked, the

 length of the interview, the extent of Deputy Sechrist’s involvement, and the

 differential treatment of Deacon as compared to Daniel.

¶ 65 After Deacon arrived at the principal’s office, he began to be questioned by

 Principal Whitaker, while Deputy Sechrist sat by the principal’s side and observed

 throughout. However, Deputy Sechrist’s testimony regarding the content of the

 interview was not exhaustive. He offered three slightly differing accounts of what

 happened: (1) initially testifying that Deacon apparently volunteered the information

 about the marijuana sale without being prompted; (2) then clarifying that Principal

 Whitaker had asked Deacon to tell them “what had taken place,” whereupon Deacon

 confessed; and (3) finally stating that Principal Whitaker had simply asked Deacon

 “where have you been for the last few days,” to which Deacon responded that he had

 skipped school for fear of being punished for the marijuana sale.

¶ 66 Though it is not clear precisely what questions Principal Whitaker asked

 Deacon, it is clear that Deacon’s grandmother was not contacted until after Deacon

 had already confessed in response to the questioning. Deputy Sechrist also stated

 that “not very many questions were even asked” prior to the grandmother being

 called—but the very phrasing of this statement implies that multiple questions were

 asked before Deacon’s guardian was notified, and that enough were asked to elicit a
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 confession. Under these circumstances, both Principal Whitaker and Deputy Sechrist

 should have known that asking these questions of a 13-year-old (who was already the

 suspect of a criminal investigation and likely knew he was a suspect, and who had

 not yet been afforded any ability to contact his guardian), would have been likely to

 result in an incriminating statement.

¶ 67 We also cannot ignore the fact that Deacon received a very different treatment

 than his classmate Daniel. After Daniel was found with marijuana on the school bus,

 he was escorted by Deputy Sechrist to the principal’s office, and his father was

 immediately contacted. Once inside the principal’s office, Daniel asked whether he

 could “speak freely,” but Deputy Sechrist expressly instructed him to “wait until your

 daddy gets here.” Daniel was not asked any questions until after his father arrived.

¶ 68 In contrast, Deacon was not advised to keep quiet until his guardian arrived,

 and Deacon’s guardian was not even contacted until after he had confessed. This

 unequal treatment underscores that the purpose of interviewing Deacon was to

 conduct a criminal investigation, not to investigate whether he had broken a school

 rule about absences. Unlike Daniel, Deacon did not have access to a guardian or

 other adult concerned with his best interest during the questioning, demonstrating

 that the purpose of the questioning was to elicit an inculpatory response from a

 criminal suspect, rather than to mete out school discipline for missing class.

¶ 69 As the State notes, it is true that Deputy Sechrist himself asked no questions
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 of Deacon during the interview, based on Deputy Sechrist’s testimony. However, as

 in In re K.D.L., Deputy Sechrist’s presence during the entirety of the interview

 “significantly increased the likelihood” that Deacon “would produce an incriminating

 response to the principal’s questioning.” 207 N.C. App. at 461, 700 S.E.2d at 772.

 Moreover, we find it relevant that Deputy Sechrist was intimately involved in the

 investigation from the outset. He investigated the original incident on the bus,

 escorted Daniel to the principal’s office, warned Daniel not to speak prior to his father

 arriving, and was present throughout Daniel’s questioning. Prior to speaking with

 Deacon, Deputy Sechrist had also performed lab tests on the substance recovered

 from Daniel to confirm it was marijuana. On the day of questioning Deacon, Deputy

 Sechrist was in uniform, he sat on the same side of the desk as the principal, and was

 present for the entire interview. Under these circumstances, Deputy Sechrist was

 more than just an observer to a school disciplinary conversation—he was a law

 enforcement officer investigating a crime.

¶ 70 Finally, we note that the trial court relied on an erroneous legal standard in

 concluding that Deacon’s interview was not a custodial interrogation. The trial court

 based its determination primarily on the “fact” that Deputy Sechrist was not “some

 strange officer in uniform” and that it was “not unusual in a school setting” for a

 student “to be called into a principal’s office.” This is not the test for whether a

 Miranda warning is required.
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

¶ 71 First, aside from the fact that there was no evidence in the record to support

 the finding that Deputy Sechrist was not a “strange officer in uniform,” it bears

 emphasizing that the Miranda inquiry is an objective, not subjective, test.

 Yarborough v. Alvarado, 541 U.S. 652, 663 (2004). Any supposed familiarity between

 a 13-year-old and an investigating officer is irrelevant under a proper Miranda

 inquiry. Id. at 668-69 (relying on a suspect’s “prior history with law enforcement” in

 a Miranda analysis is “improper” because “[t]he inquiry turns too much on the

 suspect’s subjective state of mind and not enough on the objective circumstances of

 the interrogation”) (internal marks and citation omitted).

¶ 72 Rather, the objective Miranda inquiry turns on (1) “the circumstances

 surrounding the interrogation”; and (2) whether “given those circumstances,” a

 reasonable 13-year-old would “have felt he or she was not at liberty to terminate the

 interrogation and leave.” Thompson v. Keohane, 516 U.S. 99, 112 (1995). The

 circumstances here were that Deacon, a 13-year-old suspect in a criminal

 investigation, was called out of class to be questioned in the principal’s office

 alongside the SRO; was neither told he was free to leave nor that he did not have to

 answer questions; and was not provided the option of contacting his guardian until

 after he had already confessed.

¶ 73 The trial court was required to take these circumstances into account to

 determine whether a reasonable 13-year-old in Deacon’s position would have felt free
 IN RE D.A.H.

 2021-NCCOA-135

 Opinion of the Court

 to terminate the encounter and leave. There is no indication in the trial court’s order

 that it considered or applied this standard. Accordingly, the trial court erred in

 denying the motion to suppress Deacon’s confession; in concluding that the

 questioning did not amount to a custodial interrogation; and in concluding that

 Deacon was not entitled to the protections of the Fifth Amendment or N.C. Gen. Stat.

 § 7B-2101.

 III. Conclusion

¶ 74 The trial court erred in concluding that Deacon’s confession was not the

 product of a custodial interrogation and in denying the motion to suppress Deacon’s

 confession. We therefore reverse and remand the order of the trial court.

 REVERSED AND REMANDED.

 Judges HAMPSON and CARPENTER concur.